We're going to move now to case number 5, United States v. Hernandez-Perdomo. This is appeal number 19-1964, and we'll begin with Mr. Hardwick. Good morning and may it please the court. William Hardwick of the Federal Defender Program on behalf of Mr. Hernandez-Perdomo. The issue in this appeal is whether a defendant is entitled to collaterally attack his prior removal order in a case where both he was ordered removed in absentia through no fault of his own and where he did not receive adequate notice of his administrative or judicial remedies, adequate notice that those remedies existed even past the conclusion of that in absentia removal order. Now the illegal reentry statute at 8 U.S.C. 1326D sets out three requirements for a defendant to collaterally attack a prior removal order. First, the defendant has to show that he exhausted available administrative remedies. Second, he has to show that errors in the underlying proceeding deprived him of a meaningful opportunity for judicial review. And third, he has to show that the underlying order was fundamentally unfair. Here, Mr. Hernandez-Perdomo satisfied all three of those requirements and the district court erred when it held that he could not proceed with his collateral attack. So I want to start with the first two requirements. And the issue in this case is that Mr. Hernandez-Perdomo was never adequately informed that past the conclusion of his removal hearing, which was in absentia, that he retained his administrative and judicial remedies. Now the government in this case is not contending that Mr. Hernandez-Perdomo was actually aware of some administrative or judicial remedy that he failed to pursue. And they're also not relying on an argument that the government gave him adequate notice that his remedies extended past the hearing. Instead, what the government has asked is that this court simply presume that aliens are always informed of their administrative and judicial remedies. And that even in a case where there's no evidence to suggest that the alien actually was aware and where the immigration court did not inform him that these remedies existed, that the court hold him solely responsible for his failure to pursue remedies he did not know about. Now there are two reasons why the court can't accept the government's proposition in this case. And the first is that it's squarely contrary to the Supreme Court's holding in Mendoza-Lopez. In Mendoza-Lopez, the Supreme Court held that defendants were entirely deprived the opportunity for judicial review because the immigration judge failed to adequately explain to them the scope of their appellate remedies. And that's the situation we have here as well. Now the second reason why the court can't credit the government's assertion is that even if the court were inclined to accept as a general matter that aliens should be presumed responsible for their own legal research, this is a case with a little notice that Mr. Hernandez-Perdomo did receive, was actively misleading, and would lead a reasonable person to conclude that he had missed his chance to exercise any kind of review. And in particular, I'm referring to the underlying defective notice to appear that started the immigration proceedings. And that's in the record below, at documentary number 18, page 4. And there, that notice to appear was divided into two sections. The first was titled Conduct of the Hearing. And the second was entitled Failure to Appear. In Conduct of the Hearing, Mr. Hernandez-Perdomo was informed at the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. But the second section, titled Failure to Appear, did not describe any appellate rights and did not explain to him that in a case like this one, where he is not at fault for his failure to appear, there are certain remedies that would still be available to him that would allow him to challenge his in absentia removal. Now, neither this court nor the Supreme Court has expressly addressed the question of how to handle misleading notice in the collateral attack context. But the Third Circuit's opinion in Charleswell is on point, and I think this court should look to it as persuasive authority. And in that case, the Third Circuit held that misleading notice creates a more serious due process problem than the absence of notice because it will deter a reasonable person from actually in undertaking an independent investigation to see if there are remedies that are still available to them. And in Charleswell, as here, the notice wasn't technically inaccurate, but the omissions in the notice would lead a reasonable person to believe that they had missed their chance. And the Third Circuit found in that case, we're not going to require them to undertake an investigation that's already been discouraged by the materials that the Immigration Court sent out to them. So I want to turn now to... Oh, go ahead. Go ahead. Okay. Wasn't it significant there that to the court's determination in Charleswell that there was an act of misrepresentation? So, Your Honor, in Charleswell, like here, there was an affirmative representation, which was correct. And I think in Charleswell, it was that you can take this up with the hearing officer, followed by a negative representation, which is you can't go to an immigration judge. And that was also correct in Charleswell. And here, the negative representation is if you fail to appear, then, you know, it doesn't describe your appellate rights. So it's more of an omission here, though, than an affirmative misrepresentation, like there was in Charleswell. Your Honor, in Charleswell, there was no affirmative misstatement. It was similarly an omission that you, in Charleswell, there wasn't any acknowledgement that you could pursue judicial remedies. And so, both cases involve omissions. And I think that that's significant, because that omission would lead any reasonable person who received the notice to think that at the conclusion of the hearing was their last chance to challenge the immigration judge's determination. So the final prong under 13. Oh, dear. Forgive me, but what limits are there on the right to file a motion to reopen? Could he have filed a motion to reopen his immigration proceedings as soon as he was arrested on this criminal charge at that point? He was represented by counsel, I believe. I'm sorry, Your Honor. You're asking, after this criminal case was instituted, could he still have filed the motion to reopen? Right. Your Honor, I think under this court's case law, the answer is no. And the government cites a decision of this court, Cordova-Soto, where this court held that the illegal reentry bar of 8 U.S.C. 1231A5 prevents an alien from pursuing any relief under that subsection, including the motion to reopen, after the attorney general has determined that they've illegally reentered the country. And so, I think by the time this case was instituted, Mr. Hernandez-Perdomo had already lost the right to pursue a motion to reopen. Now, the government does cite to a Ninth Circuit case where they've carved out a limited exception for an absentia removals, but this court has not reached that conclusion. So, he couldn't, for instance, file a motion to reopen his immigration proceedings now? That's our understanding, Your Honor, is that this court's decision in Cordova-Soto, as well as the language of 1231A5, which says relief under the subsection is not available after the attorney general has determined that a person illegally reentered, means that he lost his right to file the motion to reopen before this case began, and also before he gained any knowledge that the motion to reopen existed. Would he have been entitled to any relief in his immigration proceeding other than a quashing of the notice to appear? So, Your Honor, had he been aware of the motion to reopen, the motion, the order of removal would have been rescinded, and at that point, you know, the government could have decided to continue and to reopen the proceedings. And they could have just given him another notice to appear with the date and time on it, correct? That's right, Your Honor. The government could have made the determination that it wanted to continue to pursue his removal. I think the difference between, I think there's an open question, what would have happened in that case? And in this case, Mr. Hernandez-Perdomo simply hasn't been given an opportunity to have a hearing where he could put on arguments, put on evidence, put on witnesses that would establish his ultimate eligibility to remain in the country. And his prejudice is that he was denied the opportunity to have that hearing. And the removal order that was entered against him was an improper order that should not have been entered. And, you know, the government says maybe, you know, in a subsequent proceeding, in a subsequent hearing, something else would have happened. I think the question in the first place of whether the government would pursue that hearing is a matter of executive discretion. But I think the deprival of the hearing itself and his opportunity to prove that he was eligible for relief from removal is a form of prejudice that this court should consider. Would you like to reserve the remainder of your time? I would, Your Honor. Thank you. Thank you, Mr. Hardwick. We'll now hear from Ms. Wells. Good morning, and may it please the Court. Melody Wells, appearing on behalf of the United States. The defendant here has failed to satisfy any of the factors set forth in 13-2060 that are required in order to collaterally attack his underlying deportation order. And, in fact, the law requires that he satisfy all of those factors. Accordingly, the court should affirm the defendant's illegal reentry conviction. And first, I'd like to start with the failure to exhaust the at-any-time remedy that remained available to the defendant in this case. The law provides that whereas here a defendant was ordered removed in absentia, he or she can move to reopen those proceedings at any time if he did not receive notice or was in federal or state custody at the time the in absentia proceedings took place. And that remedy persisted for quite a long period of time. Even according to the argument that defense counsel has made today, that persisted for the entirety of the period after the removal order all the way through the period that the defendant was removed to Mexico from the United States. He could have moved to reopen from there. It even persisted after his illegal reentry into the United States. When does that end? Your Honor, I think the Aretha Campos case suggests that there is no limitation on that and that at-any-time means at any time. Even after indicted? Your Honor, the Cordova-Soto case that the defense has cited may have contained some language suggesting that limitation, but I think that would be at least in tension with the Aretha Campos decision, which, you know, it's the government's position. What's the government's position on when he could no longer file a motion to reopen? Your Honor, I think at-any-time means what it says, at any time. If he wanted to file one today, he could? I believe that's correct. So you're saying that Mr. Hardwick is wrong when he says he couldn't reopen now? Your Honor, at a minimum, I think everyone agrees here that it would have been available up until at least the point of indictment, which in this case was seven-plus years, which is far more than the minimum that the Seventh Circuit has said would be required. In Aretha Campos, the court made clear that 39 days alone would have been sufficient for a defendant to discover the right to reopen, even if he had not been informed of it, and to take advantage of that. And Aretha Campos also cited approvingly to another case out of the Ninth Circuit, which said that eight days would have been sufficient. So the very lengthy passage of time in this case defeats any argument that there was insufficient, there was an insufficient opportunity for the defendant to learn about this right, and then to take advantage of it. And I'd also like to make the point that the Seventh Circuit law is clear that there is no requirement that the government put the defendant on notice of this particular remedy. And we've cited several cases that are squarely on point, and I'd refer the court to Domensky, in which the circuit said that in immigration law, as well as tax law, and criminal law, knowledge of the law is presumed, and the Constitution permits the government to leave people to their own research. Similarly- Okay, so you said, look, unless I completely misheard, I thought that when Judge St. Eve asked a moment ago, could he move to reopen his immigration proceedings now, I thought you said yes. Your Honor, that's, that, I believe is that, I believe that is correct. And I only meant to distinguish that there's, at a minimum, a very limited amount of disagreement here between the parties, and that the intervening seven plus years meets all of the criteria that would be required for the court to find that there was ample opportunity for the defendant to take advantage of the remedy. And I would further add that there have been no cases cited by the defense here that say that there is such a requirement that the government provide notice under these circumstances. And in fact, the case law that the defense relies on deals, I think, exclusively with situations in which there were unknowing or unintelligent waivers of rights to appeal, which is quite a different circumstance than the right to reopen, which was not waived in any way. It persisted after the in absentia removal proceedings, and persisted after the defendant was deported. And so, in fact, Your Honor, just to carry on with that theme, it is worth emphasizing, there are no cases that the defense has cited here that stand for their fundamental proposition, that there was some obligation the government had to inform the defendant of this right. And they rely on the Charleswell case, which was not, was neither cited, I believe, in the district court, and this was not an argument that was actually made before the district court, but there are several ways in which Charleswell is distinguishable from the facts here. First of all, it was not an in absentia removal case at all. And as I stated, it does not hold that there's an affirmative obligation on the government to inform the defendant of their administrative rights. Further, in the case here in Hernandez-Perdomo, there was no reinstatement order, which is the order that's at issue in Charleswell. And so, any particular findings as to that language is not relevant. As to the argument by analogy that the language in the notice to appear was somehow misleading or confusing, it is the government's position that it absolutely was not. That language is neither misleading nor ambiguous. It simply says that at the conclusion of your removal proceedings, assuming an adverse decision, you may then appeal. It states what is absolutely true, that that appeal right kicks in at the conclusion of that hearing. It doesn't place any limitations on that. It does not say that it only exists at that period of time. And I think a reasonable reading of that sentence is consistent with the fact that you simply have a right to appeal after your deplication hearing has been concluded. Further, there is no suggestion in this case that the defendant actually was misled by the language in the NTA. There has never been an argument here or in the district court below that there was any confusion as to that, that it affected his decision making in any way. And finally, I would also point out the fact that in Charleswell, there was not a finding that the defendant had made out the 132060 factors. What actually happened in Charleswell is that the case was remanded back to the district court for findings on the prejudice prong of 132060 or the fundamental unfairness prong. And it was ultimately affirmed in the district court or excuse me, the conviction was reaffirmed in the district court and that was later affirmed in the Third Circuit as well. Lastly, I'd just like to turn to the Aretha Campos case which the defendant spends a great deal of time on, on reply. And just to point out that the factors there that the court cited apply really equally here because the emphasis in the court's decision there was on the passage of time between the removal proceedings and the subsequent criminal prosecution. And as the court pointed out, the defendant there never filed a motion to reopen, not within 90 days or 10 years or even after his arrest. And that failure to exhaust where again, there was no waiver, there was no limitation, did not excuse exhaustion. So while I have a little bit of time left, unless there are further questions from the court, I'll rest on the record and ask that the conviction be affirmed. Thank you, Ms. Wells. We'll now move back to Mr. Hardwick for rebuttal argument. Thank you, Your Honor. Just a few brief points. The first is to clarify when the motion to reopen right expired. And what 1231A5 says, it's upon reinstatement of the removal order, not the indictment in this case. So the reinstatement of the removal order occurred several months prior to his being indicted in this case. And that's the point at which the motion to reopen right expired. And the facts of Aretha Campos aren't to the contrary. Is there an exception when it's done in absentia? There's not an explicit exception, Your Honor. The Ninth Circuit, in the case of the government sites, has recognized an exception, but this court has not. And Aretha Campos is not to the contrary. And Aretha Campos, the court was considering Mr. Aretha Campos' right to file a motion to reopen prior to him actually being removed and while he was in detention awaiting removal. And if there are no further questions, nothing further. Thank you, Mr. Hardwick. Thank you, Ms. Wells. The case will be taken to revisement. Thank you.